1  **WO**

2

3

4

5

6        **IN THE UNITED STATES DISTRICT COURT**

7        **FOR THE DISTRICT OF ARIZONA**

8

9    Eric Owen Mann,                          )
                                              )    No. CV 03-213-TUC-CKJ
10             Petitioner,                     )
                                              )    <u>DEATH PENALTY CASE</u>
11   vs.                                       )
                                              )
12                                             )    **MEMORANDUM OF DECISION**
     Charles L. Ryan, et al.,[1]              )    **AND ORDER**
13                                             )
               Respondents.                   )
14   _____ )

15           Before the Court is the Amended Petition for Writ of Habeas Corpus filed by

16   Petitioner Eric Mann, a state prisoner under sentence of death.  (Dkt. 37.)[2] Petitioner alleges,

17   pursuant to 28 U.S.C. § 2254, that he is imprisoned and sentenced in violation of the United

18   States Constitution.  For the reasons set forth below, the Court concludes that Petitioner is

19   not entitled to habeas relief.

20                              **<u>BACKGROUND</u>**

21           Petitioner was convicted of two counts of first degree murder and sentenced to death

22   for the killings of Richard Alberts and Ramon Bazurto during a drug deal.  The Arizona

23   Supreme Court provided the following summary of the facts surrounding the murders:

24

25

26   _____

27        [1]      Charles L. Ryan, Interim Director of the Arizona Department of Corrections,
     is substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).
28
              [2]      "Dkt." refers to the documents in this Court's case file.

Defendant and his girlfriend, Karen Miller, rented a house in Tucson where they sold cocaine, marijuana, and guns. Typically, Karen sold "eight-balls" (one-eighth of an ounce packets) of cocaine in the evening while Defendant worked on bigger drug deals.

In late November 1989, Defendant told Karen of his plan to rip off Richard Alberts, a friend also involved in the cocaine trade. Defendant set up a deal to sell about a kilogram of cocaine for roughly $20,000. According to Karen, Defendant knew he would have to "whack" (kill) Alberts after taking the money and giving Alberts a shoebox filled with newspaper instead of cocaine.

The plan changed when Alberts showed up with another man, Ramon Bazurto. Defendant, however, quickly made up his mind "to do it." The men entered the house and followed Defendant back to the master bedroom. Karen followed behind and stood in the doorway, between Alberts and Bazurto. After trading the bag of money for the shoebox, Alberts lifted the top of the box that contained only newspaper. Almost instantaneously, Defendant shot Alberts and then Bazurto. Each was shot once, Alberts through the heart and Bazurto through the lung, severing the aorta. Both bullets passed through the bodies and traveled through the walls of the house.

Alberts died almost instantly but Bazurto did not. According to Karen, he feebly attempted to reach for the gun he was carrying in his waistband. Defendant placed his foot on Bazurto's hand to stop him and described to Karen what was happening as the victim lost motor control and died. She testified it took from three to five minutes for Bazurto to die.

Defendant got a friend, Carlos Alejandro, to help him dump the bodies near a rural road in the vicinity of Fort Grant prison, near Safford. The next day, Defendant and Karen did a thorough cleaning job to erase all traces of the murder. All the walls and floors were scrubbed and patched, and the room was repainted. Defendant gave Alberts' car to an acquaintance to whom he owed money. He also dismantled his guns, destroyed the mechanisms with a hammer, and scattered the pieces, as well as the recovered bullets, in a lake. When questioned by police, Defendant told them Alberts and Bazurto had come to the house but left after the drug deal failed.

Nothing more came of the case until January 1994 when Karen Miller ended her relationship with Defendant, allegedly because of escalating domestic violence and his threats to "do it again." After moving, she told the police about the murder. Police tracked down Alejandro and the person to whom the car had been given and were able to corroborate Karen's story. Defendant then was arrested and charged with the murders of Alberts and Bazurto. Karen Miller and Alejandro were never charged for their part in the murders or cover-up.

*State v. Mann*, 188 Ariz. 220, 223-24, 934 P.2d 784, 787-88 (1997).

At sentencing, the trial judge, Pima County Superior Court Judge John F. Kelly, found three aggravating factors: pecuniary gain, pursuant to A.R.S. § 13-703(F)(2); multiple murders under § 13-703(F)(8); and, with respect to Bazurto, cruelty and depravity under §

- 2 -

13-703(F)(6).  (RT 2/1/95 at 7-8.)[3]  Judge Kelly found that the mitigating circumstances were insufficient when weighed against the aggravators and sentenced Petitioner to death for both murders.  (*Id.* at 14.)

The Arizona Supreme Court affirmed the convictions and sentences.  *Mann*, 188 Ariz. 220, 934 P.2d 784.  Petitioner filed a petition for postconviction relief ("PCR") with the trial court.  (ROA-PCR 28.)  Following an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel, Judge Kelly denied the petition.  (Dkt. 45, Ex. B.)  Petitioner filed a petition for review (*id.*, Ex. C), which the Arizona Supreme Court denied.

## STANDARD FOR HABEAS RELIEF

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA).  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982).  To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78

---

[3]  "RT" refers to the court reporter's transcript.  "ROA" refers to the record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case. No. CR-95-007-AP).  "ROA-PCR" refers to the record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-02-0022-PC).  Certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on November 18, 2004.  (Dkt. 55.)

(1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

For properly exhausted claims, the AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. at 206). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but

"objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

## ANALYSIS

### Claim 1        Ineffective Assistance of Counsel – Guilt Stage

Petitioner alleges that counsel performed at a constitutionally ineffective level by failing to present Petitioner's testimony at trial. (Dkt. 37 at 42.) He contends that counsel's decision was not based on reasonable trial strategy given that Petitioner's testimony was necessary to support the theory that he shot the victims in self defense.

Background

Petitioner was represented by David Sherman, an experienced criminal defense attorney who had previously handled death penalty cases, although Petitioner's was the first such case that proceeded through sentencing. (*See* RT 4/30/01 at 3-5.) In his opening statement, Sherman set out the defense theory, which was that during the drug deal "someone panicked and . . . Eric acted before someone else acted out of panic, out of fear but not out of premeditation, not out of a malicious plan, not out of anything that was planned until what happened in that room that night." (RT 10/25/94 at 146-47.) To support this theory,

Sherman outlined the dangers inherent in the drug underworld in which Petitioner was operating at the time of the shootings, including potential confrontations with armed drug dealers and users, undercover police officers, and informants. (*Id.* at 147-48.) He explained that Petitioner and Alberts were friends who had engaged in drug deals in the past. (*Id.* at 149.) Finally, Sherman described the defense version of the shootings, in which Petitioner, already on edge due to Bazurto's unexpected presence at the drug transaction, fired at Alberts and Bazurto in reaction to a perceived movement on the latter's part.[4] (*Id.* at 149-51.)

Sherman advanced the defense theory during his cross-examination of the State's witnesses, including Karen Miller, who confirmed that Alberts was known to be armed and that Bazurto's presence was unexpected and upsetting to Petitioner. (RT 10/26/94 at 90-91.) Sherman questioned Miller regarding her ability to view and recall the scene, particularly Bazurto's actions prior to the shooting. (*Id.* at 93-97.) Under Sherman's cross-examination

---

[4] In his opening statement, Sherman detailed the events leading to the shootings, specifically informing the jury that:

> Richard Alberts broke the rules. He broke the plan. . . . He said he was going to come alone to Eric Mann's house, but he didn't come alone. He came with a stranger, someone that Eric did not know. Richard brought a stranger to Eric's home. Eric was very upset. Eric didn't like this. Is this guy a narc? Is this guy an undercover cop? Who is this guy? What's going on? Eric is immediately upset. Richard assures him, don't worry, it's okay. . . .
>
> They come in the house. They go in the back bedroom. Just when the transaction is taking place, something happened that caused and forced Eric to act before someone else acted before him. You'll find out that Ray Basurto [sic] was the stranger. He's the person they don't expect to be there. He's armed. He's got guns on him, more that one, I believe. Richard Alberts has guns on him. Ray Basurto [sic] is high on cocaine. . . . It's two against one. There's Richard on one side of the room. Ray on the other side of the room. Eric in the middle. And just when the transaction took place, Ray Basurto [sic] did something that made Eric think he was about to be the victim of a drug rip-off himself. So in a spontaneous act, he fired at both people and killed them both because he felt like he was forced to do so. He didn't plan it. He wasn't happy about it. He didn't premeditate it.

(RT 10/25/94 at 150-51.)

Miller acknowledged that there was no pre-planning with respect to disposing of the bodies or cleaning up the scene. (*Id.* at 98-99.) Sherman also elicited beneficial information during his cross-examination of Carlos Alejandro, who testified that Petitioner told him that he "had no choice" and "had to" shoot Alberts and Bazurto and that Petitioner appeared remorseful for his actions. (RT 10/27/94 at 47-48.)

At closing, Sherman argued that reasonable doubt existed as to the first degree murder charges and that the State had not rebutted the claim of self-defense. (RT 11/1/94 at 54-59.) The trial court instructed the jury on self-defense and lesser-included offenses of first degree murder. (*Id.* at 92-98.)

Petitioner raised this claim of ineffective assistance in his PCR petition. (ROA-PCR 28.) Judge Kelly held an evidentiary hearing at which both Sherman and Petitioner testified. Sherman stated that he and Petitioner had discussed whether Petitioner should testify. (ROA-PCR, Appx. 4A (RT 4/30/01) at 13.) Sherman wrote a letter dated September 26, 1994, in which he reiterated the defense strategy, indicating that he intended to challenge Miller's testimony in an attempt to convince the jury that Bazurto "went for his gun and you reacted quickly." (Dkt. 45, Ex. D; ROA-PCR, Appx. 4A at 13.) Sherman wrote that the only tactical decision left was whether Petitioner would take the stand. (Dkt. 45, Ex. D.) The letter also discussed the potential drawbacks if Petitioner were to testify, including the possibility that information on Petitioner's prior convictions would be admitted. (*Id.*)

At the evidentiary hearing, Sherman testified that Petitioner had confessed to him during their first or second meeting, several months before Sherman wrote the September 26 letter, that he had premeditated the murders (ROA-PCR, Appx. 4A at 18, 45-46); he never told Sherman that he had acted in self defense (*id.* at 59). Sherman explained that he had informed Petitioner that the choice was his, but if he testified Sherman would be ethically bound to withdraw on the grounds that testimony indicating that Petitioner acted in self-defense would constitute perjury. (*Id.* at 18, 47-48.) Sherman explained that in his letter to Petitioner, which seemed to indicate that the option of calling Petitioner as a witness remained open, he was "finessing the situation" and "did not want to put in writing what

[Petitioner] had told me the first time and lay out what the perjury would be"; instead, he was "laying out generally what [Petitioner's] alternatives are, knowing that we've already talked about the fact that I didn't think it was a good idea and I couldn't be his lawyer if he was going to do that." (*Id.* at 49.) During the evidentiary hearing, the State introduced a letter written by Petitioner after his conviction and sentencing in which he thanked Sherman and stated that he could not have had a better lawyer. (*Id.* at 50.)

Petitioner testified that he told Sherman he had acted in self defense, shooting Alberts and Bazurto only after the latter had reached for his gun. (ROA-PCR, Appx. 4B (RT 8/31/01) at 8.) He also testified that he never told Sherman the killings were premeditated. (*Id.* at 11.) Petitioner stated that he did not testify at trial because Sherman thought it would be a bad idea given his prior record. (*Id.* 13-14.)

Judge Kelly, evaluating this contradictory testimony, rejected Petitioner's claim that Sherman's failure to call him as a witness amounted to ineffective assistance of counsel:

> Sherman testified at the evidentiary hearing that Defendant confessed to him to having premeditated the killings and that, under the ethical rules, he was therefore unable to allow Defendant to testify to the contrary. According to Sherman, he told Defendant that if he insisted on testifying, Sherman would have to withdraw as his attorney. Defendant now denies that he confessed to Sherman and otherwise disputes Sherman's recollections, but this Court finds Sherman to be more credible than Defendant. The Court finds, therefore, that Sherman's decision not to call Defendant to the stand does not constitute deficient performance. Further, the Court finds that Defendant acquiesced in that decision because he did not ask Sherman to withdraw from representing him. Accordingly, the claim is denied.

(Dkt. 45, Ex. B at 5.)

<u>Clearly established federal law</u>

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466

U.S. at 689.  Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*  "The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687-88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference.  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance,* 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under the AEDPA).  Therefore, to prevail on this claim Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an objectively unreasonable application of *Strickland*.  28 U.S.C. § 2254(d)(1).

<u>Analysis</u>

Petitioner contends that the PCR court's rejection of this claim constituted an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.  (Dkt. 37 at 46-47.)  The Court disagrees.

Petitioner's burden with respect to this allegation is especially difficult to meet

because "the advice provided by a criminal defense lawyer on whether his client should testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) (internal quotation omitted); *see United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (counsel not ineffective for failing to call defendant to the stand, despite defendant's repeatedly expressed desire to testify, because "[i]t was a reasonable tactical decision to rely exclusively on attacking the Government's witnesses and presenting independent testimony rather than to subject [defendant] to all of the risk attendant on cross-examination"); *Smith v. Jones*, 923 F.2d 588, 590 (8th Cir. 1991) (strategic decision not to call defendant to testify, based on concerns about his credibility, was not ineffective assistance); *United States v. Dyer*, 784 F.2d 812, 817 (7th Cir. 1986) (decision whether defendant should testify is a "tactical choice of trial strategy" and thus not subject to review).

Petitioner cannot satisfy his burden with respect to this claim because Sherman's decision not to call him as a witness was based on legitimate ethical concerns to which counsel appropriately responded by allowing Petitioner to choose not to testify or to proceed with different counsel. *See Nix v. Whiteside*, 475 U.S. 157, 176 (1986) (because a defendant has no constitutional right to present perjured testimony, a lawyer's refusal to facilitate a client's perjury does not constitute ineffective assistance of counsel). The Court rejects Petitioner's allegation that the PCR court's decision was the product of a defective fact-finding process and that Judge Kelly made an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) when he concluded that Petitioner admitted to counsel that he did not act in self defense. Judge Kelly did not ignore the evidence presented at the evidentiary hearing, including Sherman's letter to Petitioner concerning defense strategy, but assessed the testimony of Petitioner and Sherman and found that Sherman's version of events was more credible. Petitioner falls far short of rebutting Judge Kelly's findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Moreover, even if Judge Kelly had erred in his factual determinations regarding Petitioner's "confession" to counsel, Petitioner would not be entitled to relief under

*Strickland*. The cases relied on by Petitioner in support of this claim are distinguishable because counsel in those trials specifically promised that their client would testify. For example, in *Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003), counsel in his opening statement informed the jury that the defendant "will testify . . . and tell you that he was not involved." The Seventh Circuit held that counsel's failure to fulfill that explicit promise constituted deficient performance because counsel abandoned the promise based on concerns that were apparent at the time the promise was made. *Id.* at 257-58. Similarly, in *Ouber v. Guarino*, 293 F.3d 19, 22 (1st Cir. 2002), counsel repeatedly vowed during his opening statement that the defendant would be a "witness" and the jury would hear her "testimony." The court of appeals held that counsel's "serial announcement" that the jury would hear from the defendant, together with his subsequent decision to advise her not to testify, constituted ineffective assistance. *Id.* at 26-28. As the court explained:

> [counsel] did not hedge his bets, but, rather, acted as if he had no doubt about whether his client should testify. In the course of his opening statement, he promised, over and over, that the petitioner would testify and exhorted the jurors to draw their ultimate conclusions based on her credibility. In fine, the lawyer structured the entire defense around the prospect of the petitioner's testimony.

*Id.* at 28.

Notwithstanding Petitioner's arguments to the contrary, in his case Sherman did not make – and therefore did not break – a promise that Petitioner would testify. He stated only that the evidence would show that the killings were not premeditated and that Petitioner reacted in self defense to Bazurto's movements. This was supported to a degree by the testimony of Miller and Alejandro. In fact, through his cross-examination of these witnesses, Sherman was able to deliver some of what he promised – evidence that the killings were not planned. *See Sleeper v. Spencer*, 510 F.3d 32, 41 (1st Cir. 2007) (no ineffective assistance where evidence promised in opening statement was consistent with defense actually presented at trial).

Thus, Sherman's opening statement on Petitioner's behalf bears a much closer resemblance to the statement at issue in *Barrow v. Uchtman*, 398 F.3d 597, 606 (7th Cir.

2005), where defense counsel informed the jury that "we will tell you about" the crime and the defendant's denial of involvement. Counsel left that promise unfulfilled, however, by failing to present any exculpatory evidence. *Id.* at 601. Nevertheless, the Seventh Circuit affirmed the state court's determination that no *Strickland* violation occurred. The court, distinguishing its prior holding in *Hampton*, explained:

> in *Hampton*, we placed special importance on the fact that trial counsel had specifically promised the jury that the defendant would testify *himself*. Here, while it is undisputed that Barrow's attorney promised to present exculpatory evidence, and while, by presenting his opening statement in the first person plural (using the pronoun 'we'), he arguably insinuated that Barrow would participate personally in the defense, counsel made no explicit promise that Barrow would testify himself.

*Id.* at 606-07.

Sherman likewise did not explicitly tell the jury that it would hear from Petitioner or promise any specific evidence. In his opening statement, he set out the defense version of what occurred and then, without offering perjured testimony from Petitioner, presented sufficient evidence at trial to warrant a self-defense instruction. The fact that Petitioner was convicted despite Sherman's efforts does not establish that he was denied effective assistance of counsel. As the *Strickland* Court explained: "It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." 466 U.S. at 689.

Judge Kelly's rejection of this allegation of ineffective assistance was not objectively unreasonable. Therefore, Claim 1 is without merit and will be denied.

**Claim 2      Ineffective Assistance of Counsel – Sentencing**

Petitioner alleges that counsel performed ineffectively at sentencing by failing to investigate and present additional evidence concerning Petitioner's social history, including the effects of a 1985 traffic accident, and by failing to retain a defense mental health expert. (Dkt. 37 at 52.)

Background

In June 1994, several months prior to trial, Sherman contacted the Arizona Capital

Representation Project in Phoenix to "brainstorm" and get suggestions for both the guilt and penalty phases of trial. (ROA-PCR, Appx. 4A (RT 4/30/01) at 51.) Sherman also enlisted the assistance of an investigator and a law clerk who helped him prepare the case. (*Id.* at 52.)

Following Petitioner's conviction, Sherman moved for the appointment of a mental health expert, suggesting Dr. Todd Flynn, a clinical psychologist with the Pima County Court Clinic; the court appointed Dr. Flynn. (ROA at 284-85; RT 11/16/94 at 3-4.) To assist Dr. Flynn in his evaluation, Sherman subpoenaed Petitioner's records from the Pima County and San Diego juvenile departments, from federal and state probation departments, and from two treatment centers. (*See* ROA at 287-92, 311-35.) Dr. Flynn reviewed these documents and other biographical information, performed a clinical interview, and administered psychological tests. (ROA-PCR, Appx. 12.) Dr. Flynn diagnosed Petitioner with the following conditions: alcohol abuse, polysubstance abuse or dependence, and antisocial personality disorder. (*Id.* at 7-8.)

Based on his findings, Dr. Flynn discussed several potential mitigating factors. (*Id.* at 8-9.) He suggested that Petitioner's history of drug and alcohol abuse, combined with the fact that he was raised in a "criminal lifestyle" without "healthy socialization experiences," resulted in a lack of emotional, cognitive, and social development such that his immaturity might be considered a statutory mitigating factor based on developmental rather than chronological age. (*Id.* at 8-9.) With respect to nonstatutory mitigating circumstances, Dr. Flynn indicated that Petitioner's family history may have contributed to his antisocial personality disorder which in turn contributed to his criminal conduct at the time of the murders. (*Id.* at 9.)

Prior to sentencing, Sherman filed a sentencing memorandum in support of mitigating factors. (ROA at 356-88.) In the memorandum and at the presentence hearing, Sherman argued that in comparison with other first degree murders Petitioner's crime was not so egregious that it warranted the death penalty. (*Id.*; RT 1/31/95 at 62, 83.) He also argued that several mitigating factors called for leniency: Petitioner's dysfunctional family background, his history of substance abuse, remorse for the crimes, a good relationship with

his daughters and with his mother, a stable employment record, lack of educational opportunities, lack of a violent criminal record, good conduct while incarcerated, the disproportionate treatment of his accomplices, and his cooperation with authorities. (ROA at 356-88; RT 1/31/95 at 73-117.)

Sherman also submitted a lengthy autobiography written by Petitioner which detailed his troubled family background, including his initiation as a child into his father's criminal activities, as well as his history of drug and alcohol abuse. (*See* Pima Co. Presentence Rpt.) Petitioner also discussed a car accident that occurred in 1985 in which his two passengers, a teenage girl and her mother, were killed and Petitioner suffered a broken leg. (*Id.*)

At the presentence hearing, Sherman presented testimony from Petitioner's mother and his older daughter, Jill, as well as an employer and a co-worker. Petitioner's mother testified that his father was an alcoholic who was involved in criminal activities, possibly with the mafia. (RT 1/31/95 at 42.) Mr. Mann physically abused her and her older son but did not abuse Petitioner. (*Id.* at 43-44.) Petitioner witnessed the abuse and tried to protect his mother. (*Id.* at 44.) Ms. Mann testified that Petitioner's father, with his underworld activities, his alcoholism, and his attempts to turn Petitioner into a "tough guy" like him, was a poor role model. (*Id.* at 48.) She also testified that Petitioner, who fathered a child and was married at age fifteen, was a good father to his daughters. (*Id.* at 47.) Petitioner's daughter testified that she loved her father and he loved her; he tried to be a positive influence by cautioning her against using drugs and following the path he had taken. (*Id.* at 29, 36.) The other witnesses testified that Petitioner was dependable, hard working, and a good family man. (*Id.* at 8-27.)

Judge Kelly found that no statutory mitigating factors existed. (RT 2/1/95 at 8.) With respect to nonstatutory mitigation, he determined that Petitioner had proved the following: that he had a good relationship with his daughters and his mother; that he had experienced an "unstable and abusive family background," which included being "introduced to a criminal life-style at a very early age by his own father" and being "subjected to his father's alcoholism and domestic violence at an early age"; that he had a poor educational experience,

dropping out of school at a young age; that he suffered from substance abuse which "began at a very early age" and "stunted his social and emotional growth," as a result of which "he exercises poor judgment at times"; that he had conducted himself without incident while incarcerated; and that he had a stable employment record in the period preceding his arrest. (*Id.* at 9-13.) Judge Kelly found that Petitioner was not under the influence of drugs or alcohol at the time of the murders and determined that Petitioner had failed to prove the remaining mitigating circumstances, including remorse, cooperation with authorities, disproportionate sentences, and a nonviolent criminal record. (*Id.* at 10-13.) Judge Kelly concluded that the proven mitigating factors were "not sufficiently substantial to call for leniency." (*Id.* at 14.)

Petitioner raised his allegations regarding Sherman's performance at sentencing in his PCR petition. (ROA-PCR 28.) Petitioner sought and the PCR court authorized the appointment of Dr. Richard Hinton to perform a psychological evaluation. (ROA-PCR 31, 34.) Subsequently Petitioner sought and the court authorized funds for a neuropsychological examination; Dr. James Comer performed the exam. (ROA-PCR 40, 43.)

According to Dr. Hinton's report, Petitioner "may meet criteria for diagnosis with Major Depression." (ROA-PCR 44, Ex. at 6.) Petitioner rated in the average to low-average range in cognitive function, and there was "no obvious indication of organic impairment." (*Id.*) Dr. Hinton stated that Petitioner's development was hampered by early exposure to domestic violence and family discord, and this dysfunction led to drug use and criminal activities. (*Id.*) He further indicated that Petitioner's history of instability in personal relationships and "poor emotional modulation," compounded by drug use, "suggests the possible diagnosis of a Personality Disorder." (*Id.*) Notwithstanding Petitioner's long history of criminal behavior predating 1985, Dr. Hinton opined "it does appear that his functioning changed dramatically following the automobile accident." (*Id.*) Finally, Dr. Hinton described Petitioner as "characterologically somewhat distrustful and . . . suspicious," a "tendency [that] was likely exacerbated when he was under the influence of cocaine." (*Id.* at 7.) According to Dr. Hinton, "[i]t is thus reasonable to believe that Mr. Mann may have

misperceived or exaggerated his perception of threat from the victims at the time of the offense and behaved impulsively in response." (*Id.*) Dr. Hinton reiterated that if Petitioner had been under the influence of drugs, "his judgment may have been further compromised." (*Id.*)

Judge Kelly held an evidentiary hearing on Petitioner's ineffective assistance claims. Sherman testified that he did not specifically focus on mitigation prior to the sentencing phase, although the defense team was "talking to everybody about Eric's life, . . . collecting information that was later used for mitigation in a general sense." (ROA-PCR, Appx. 4A at 21.) However, Sherman did not obtain or present Petitioner's financial, school, Department of Corrections, or medical records. (*Id.* at 23-25.) Although he was aware of the 1985 car accident from a report prepared by his investigator, Sherman did not conduct additional investigation, nor did he recall Petitioner, his daughter, or his mother ever mentioning the accident. (*Id.* at 7-9, 52.) Sherman acknowledged that he did not interview Karen Miller. (*Id.* at 6-7.) He could not recall whether he considered obtaining a mental health evaluation in addition to the one performed by Dr. Flynn; nor could he remember whether he sought to exclude Dr. Flynn's report at sentencing. (*Id.* at 29-30)

At the PCR evidentiary hearing, Petitioner testified about the effects of the traffic accident, stating that his behavior changed thereafter, particularly with respect to his ability to "think constructively." (ROA-PCR, Appx. 4B at 19.) He also testified that he was "devastated" by the deaths of his passengers and felt remorse. (*Id.* at 18.)

Karen Miller[5] also testified about the 1985 accident, stating that Petitioner "sustained blows to his head" and that after the accident his personality changed; he felt guilt and remorse and became depressed. (ROA-PCR, Appx. 4D (RT 4/30/01) at 11-15.) Petitioner was unable to work and the attendant financial difficulties caused additional stress. (*Id.*) He

---

[5] At the time of 2001 PCR evidentiary hearing, Miller was married and had changed her last name to Tappan. For ease of reference the Court will continue to use the name Miller.

also began to use drugs more heavily and became abusive to Miller. (*Id.*)

Dr. Comer, a clinical neuropsychologist, evaluated Petitioner, prepared a detailed report (ROA-PCR 60, Ex.), and testified at the evidentiary hearing. His report and testimony focused on the effects of Petitioner's automobile accident. Dr. Comer stated that Petitioner showed signs of cognitive impairment consistent with brain trauma. (ROA-PCR, Appx. 4C (RT 8/31/01) at 9.) Dr. Comer also indicated, however, that if Petitioner had suffered a closed head injury during the accident, he recovered "rather well," albeit with "some residual, subtle cognitive defects." (*Id.* at 10.) These effects would have been more severe closer to the time of the accident. (*Id.* at 13.) Dr. Comer testified that from the information he had reviewed Petitioner demonstrated symptoms consistent with postconcussional syndrome. (*Id.* at 14-17.) According to Dr. Comer, the record showed "a rather abrupt behavioral change, emotional change" after the 1985 accident, with Petitioner exhibiting increased aggressiveness, disinhibition, irritability, and poor self-monitoring. (*Id.* at 18.) These conditions could have contributed to Petitioner's conduct four years later at the time of the murders. (*Id.*) Significantly, although Dr. Comer testified that he did not have access to the medical records relating to the accident, and therefore could not determine what diagnostic steps or treatments occurred with respect to possible brain trauma (*id.* at 26-27, ROA-PCR 60, Ex. at 2), the documents were part of the PCR record and did not indicate that Petitioner was examined or treated for a closed head injury (*see* PCR-ROA 42).

Following the PCR evidentiary hearing, Judge Kelly rejected Petitioner's claim that Sherman had performed ineffectively by failing to uncover and present additional available mitigation evidence. (Dkt. 45, Ex. B at 3-4.) Specifically, Judge Kelly determined that Petitioner had not demonstrated that he was prejudiced by Sherman's performance, noting that "[s]ome of the evidence he accuses Sherman of not presenting, e.g., testimony from family members, was in fact presented to this Court at sentencing." (*Id.*)

Judge Kelly next indicated that he had already addressed, in denying Petitioner's claims regarding "new evidence," Petitioner's arguments based on "[a]dditional evidence that pertains to the 1985 accident and its effects." (*Id.* at 3.) With respect to such evidence,

Judge Kelly explained:

> The record shows that Defendant provided this Court with evidence of the accident and its effects in the form of an autobiography he presented to show mitigation. Nonetheless, additional evidence, particularly that set forth in psychological reports, was submitted as part of this Petition. The Court finds, however, that nothing presented would have changed the verdict or the sentence imposed. The Court finds that Defendant has not proven the existence of a causal connection between the accident and its effects and the murders. The record shows, for example, that Defendant dealt drugs and used guns against others before and after the accident; that he did not misperceive a threat and overreact, but, rather, carefully planned to kill Alberts, then "made a choice, after a period of thought and said, 'Well, I've got to do it,' apparently meaning that to go through with the plan he would also have to murder Bazurto." Defendant committed these murders for pecuniary gain, not for reasons traceable to his 1985 accident.

(*Id.* at 2-3 (citation omitted).)

Finally, Judge Kelly rejected Petitioner's claim of ineffective assistance based on Sherman's failure to request an independent mental health expert and failure to object to the court-ordered evaluation. (*Id.* at 4.) Judge Kelly found neither deficient performance nor prejudice:

> This Court finds no fault with Sherman's performance. He properly requested a psychological evaluation of Defendant in order to develop any mitigation the evaluation might produce. Sherman is not responsible for the results of the court clinic evaluation; Defendant can only speculate that another, independent evaluation would have yielded more favorable results. This Court has read the January 19, 2001, evaluation by Dr. Hinton, which Defendant argues differs significantly from the clinic evaluation. But had this report been available at sentencing, it would not have changed the sentence imposed. Dr. Hinton notes Defendant's "habitual criminal behavior" and personality disorder. But to the extent that it differs from the clinic evaluation, this Court believes the clinic evaluation. The flaw in Dr. Hinton's report is that, for its conclusions to have weight, Defendant must have been under the influence of cocaine or other drugs at the time of the murders. Indeed, Dr. Hinton speculates that Defendant may have "behaved impulsively in response" to threatening behavior from the victims. The record, however, clearly indicates otherwise: Defendant was not under the influence of any drugs when he carefully planned and carried out these murders. Because Dr. Hinton's conclusions are based on such errors, this Court must discount them. Because Defendant cannot show that Sherman's performance was deficient, much less that such performance prejudiced him, he has failed to prove that Sherman acted ineffectively. Accordingly, this claim is denied.

(*Id.*)

Clearly established federal law

The right to effective assistance of counsel applies not just to the guilt phase but "with

- 19 -

equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Strickland*, 466 U.S. at 689-90. The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687).

With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

The clearly-established federal law governing this claim includes the Supreme Court's decision in *Bell v. Cone*, 535 U.S. 685 (2002), which clarifies the standard this Court must apply in reviewing the PCR court's rejection of Petitioner's sentencing-stage ineffective assistance claim. In *Cone*, the Supreme Court, after noting the deferential standards set forth in the AEDPA and required by its own precedent, explained that for a habeas petitioner's ineffective assistance claim to succeed:

> he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

- 20 -

*Id.* at 698-99 (citation omitted); *see Visciotti*, 537 U.S. at 25-27.

In reviewing Petitioner's allegations of ineffective assistance, this Court further notes that the judge who presided over the trial and sentencing also presided over the PCR proceedings. Thus, in considering Petitioner's ineffective assistance claims, Judge Kelly was already familiar with the record and the evidence presented at trial and sentencing. The judge's familiarity with the record provides this Court with an additional reason to extend deference to the state court's ruling. *See Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998). As the Ninth Circuit explained in *Smith*, when the judge who governed the post-conviction proceeding is the same as the trial and sentencing judge, the court is considerably less inclined to order relief; doing so "might at least approach 'a looking-glass exercise in folly.'" *Id.* (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)).

<u>Analysis</u>

Petitioner contends that the PCR court's rejection of this claim was contrary to and an unreasonable application of *Strickland*. (Dkt. 37 at 55.) Petitioner offers several arguments in support of this contention. As set forth below, these arguments are unpersuasive.[6]

First, Petitioner contends that Judge Kelly, by finding that the omitted evidence "would not have changed the sentence," applied an incorrect standard in assessing prejudice under *Strickland*. The Court disagrees. Judge Kelly was the sentencer; when presented with the additional evidence Petitioner contended should have been offered at sentencing, he determined not merely that there was no reasonable probability that the new information would have changed the sentence, but that it in fact would not have changed the sentence. Judge Kelly, by determining that there was *no probability* that a different sentence would

---

[6]     Although Judge Kelly applied both prongs of *Strickland* to one of Petitioner's sentencing-stage ineffective assistance claims, Petitioner's claim here focuses on prejudice. Adhering to *Strickland*'s instruction, 466 U.S. at 697, the Court has concluded that Claim 2 can be disposed of based on the lack of prejudice and thus makes no finding with respect to the competence of Sherman's performance at sentencing.

have resulted if Sherman had presented the omitted information concerning Petitioner's social history and the effects of the 1985 traffic accident, necessarily found that Petitioner failed to satisfy the *Strickland* "reasonable probability" standard for prejudice.

The Court also rejects Petitioner's argument that in considering this claim, Judge Kelly applied an inappropriate "nexus" or causal connection test, thereby rendering unreasonable his application of *Strickland*.[7] At sentencing, Judge Kelly determined that Petitioner's dysfunctional family background and history of drug abuse constituted nonstatutory mitigating circumstances. If counsel had presented additional evidence about the effects of the 1985 accident, Judge Kelly would have been obliged to consider the evidence in mitigation. Petitioner's present complaint that Judge Kelly, when ruling on Petitioner's *Strickland* claims during the PCR proceedings, did not properly weigh the new mitigating information does not state an argument that Petitioner was prejudiced by Sherman's performance at sentencing. Moreover, Petitioner's criticism of Judge Kelly's handling of the new information is not well founded. In applying the *Strickland* standard for prejudice, which requires a weighing of mitigating information, it was appropriate for Judge Kelly to consider both the strength of the new evidence and the lack of causal connection between it and Petitioner's criminal conduct – a connection which Petitioner himself attempted to make during the PCR proceedings.

To show that Sherman performed ineffectively at sentencing, Petitioner offered during the PCR proceedings the opinions of Drs. Hinton and Comer, among other testimony, indicating that after the traffic accident Petitioner's personality and behavior changed, becoming more impulsive and violent, perhaps due to a brain injury. These changes, according to Petitioner, were responsible for his conduct at the time of the shootings. Petitioner argues that a competent lawyer would have presented this evidence in mitigation

---

[7] As discussed below in Claim 4, under *Tennard v. Dretke*, 542 U.S. 274 (2004), courts may not foreclose consideration of mitigating evidence based on a nexus requirement – i.e., a causal connection between the crime and the mitigating circumstance offered by the defendant.

at sentencing and that doing so would have resulted in a reasonable probability of a different sentence. Having made that argument, Petitioner cannot now fault Judge Kelly for evaluating the mitigating effect of the new evidence by assessing its credibility in the light of other facts about Petitioner's lifestyle and personality prior to the accident and his conduct in planning and carrying out the drug rip-off and murders.

Judge Kelly did not apply *Strickland* unreasonably in finding that Petitioner failed to show that he was prejudiced by Sherman's performance at sentencing. With the exception of remorse, Judge Kelly found that the mitigating circumstances presented at sentencing – which are the same circumstances Petitioner continues to advance in this claim – were in fact proven. Moreover, when presented with evidence that Petitioner was remorseful, both after the murders and following the fatal car accident, Judge Kelly determined that it would not have altered his sentencing decision.

Judge Kelly likewise heard and considered new evidence that Petitioner might have suffered brain injury as a result of the accident, and that the injury, rather than an antisocial personality disorder as diagnosed by Dr. Flynn, was the cause of Petitioner's criminal conduct. Petitioner has not shown that there was anything unreasonable about Judge Kelly's assessment of that evidence, which, with respect to the diagnosis of brain trauma, was equivocal at best and even less compelling as an explanation of Petitioner's character and conduct at the time of the murders. *See Hall v. Head*, 310 F.3d 683, 704 (11th Cir. 2002) (no prejudice where omitted mental health evidence "plagued with speculation and conjecture"). Therefore, Sherman's failure to request a defense mental health expert such as Dr. Hinton or Dr. Comer, who could have provided such testimony at sentencing, did not constitute ineffective assistance of counsel. *See Pizzuto v. Arave*, 280 F.3d 949, 962-63 (9th Cir. 2002) (no showing of ineffective assistance based on counsel's failure to seek an independent mental health expert).

Similarly, Petitioner has not shown that additional investigation into his family background would have revealed persuasive mitigating information that Sherman omitted at sentencing. To the contrary, in setting out the details of his dysfunctional family

background, Petitioner again relies on the autobiography that was presented to Judge Kelly at sentencing. (*See* Dkt. 37 at 15-20.) Thus, in contrast to cases such as *Rompilla v. Beard,* 545 U.S. 374 (2005), *Wiggins*, and *Williams*, Petitioner has not proved that significant information about his background was actually omitted at sentencing.[8]

In sum, the information offered by Petitioner during the PCR proceedings did not significantly alter "the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 700; *see Woods v. McBride*, 430 F.3d 813, 826 (7th Cir. 2005) (rejecting claim that "boil[ed] down to the contention that counsel did not present enough mitigating evidence"); *Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir. 1996) ("counsel's failure to throw a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in Eddmonds' favor"); *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *see also Landrigan*, 550 U.S. at 480 (no prejudice based on failure to present "weak" mitigating evidence). There is simply no basis to conclude that if Sherman had offered at sentencing the additional evidence presented during the PCR proceedings, there was a reasonable probability of a different sentence; in fact, the record supports only the opposite conclusion. The new mitigating information was neither weighty nor credible and Judge Kelly, when presented with all of the new evidence, expressly stated that it would not

---

[8]     In *Rompilla,* counsel failed to present evidence that his client was beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; and that he grew up in a home with no indoor plumbing and was not given proper clothing by his parents. 545 U.S. at 391-92. In *Wiggins*, counsel failed to present evidence that the defendant suffered consistent abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was homeless for portions of his life, and had diminished mental capacities. 539 U.S. at 535. In *Williams*, counsel failed to discover "records graphically describing Williams's nightmarish childhood," including the fact that he had been committed at age eleven, had suffered dramatic mistreatment and abuse during his early childhood, and was "borderline mentally retarded." 529 U.S. at 370-71, 395.

have changed his decision to sentence Petitioner to death.[9]  Under these circumstances, any error by Sherman does not "undermine confidence in the outcome" of the sentencing proceeding or render it "unreliable" or "unfair." *Strickland*, 466 U.S. at 694; *see Burger v. Kemp*, 483 U.S. 776, 795-96 (1987); *Bible v. Ryan*, --- F.3d ----, 2009 WL 1874343 (9th Cir. 2009) (omission of speculative and cumulative mitigating information did not undermine confidence in sentence).

Because Judge Kelly's rejection of this claim was not objectively unreasonable, Claim 2 is without merit and will be denied.

**Claim 3        *Ring* Violation**

Petitioner correctly acknowledges that this claim is meritless under *Schriro v. Summerlin*, 542 U.S. 348 (2004).  (Dkt. 56 at 45.)  Claim 3 is denied.

**Claim 4        Independent Review of Sentence**

Petitioner alleges that his rights under the Eighth and Fourteenth Amendments were violated because the Arizona Supreme Court, in affirming his death sentence, failed to "afford the individualized treatment required by [United States] Supreme Court precedent." (Dkt. 37 at 69.)  Respondents contend that the claim is not exhausted.  (Dkt. 45 at 37-38.) Regardless of its procedural status, the claim is meritless and will be denied.  *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (holding that a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under (b)(2) as "plainly meritless").

On direct appeal, the Arizona Supreme Court explained its duty in reviewing Petitioner's death sentence:

---

[9]        Petitioner also alleges that Sherman's failure to interview Karen Miller prejudiced Petitioner with respect to the state courts' finding that the murder of Bazurto was especially cruel.  (Dkt. 37 at 66-67.)  (*See* Claim 8 below.)  This allegation of ineffective assistance was not raised in state court and is therefore unexhausted.  It is also meritless. Petitioner cannot show prejudice because Miller's testimony at the PCR hearing about the circumstances of Bazurto's death (ROA-PCR, Appx. 4D (RT 4/30/01) at 34, 46, 51) was not substantively different from her trial testimony.

This court independently reviews death sentences for error, determines whether the aggravating circumstances have been proved beyond a reasonable doubt, considers any mitigating circumstances, and then weighs the aggravating and mitigating circumstances in deciding whether the mitigating circumstances are substantial and warrant leniency.

*Mann*, 188 Ariz. at 226, 934 P.2d at 790

The court proceeded to discuss the mitigating factors offered by Petitioner at sentencing, including the disparity in sentencing of his accomplices, his remorse, his nonviolent history and cooperation with authorities, his relationship with his mother and daughters, positive changes since incarceration, his history of substance abuse, and his traumatic childhood. *Id.* at 230-31, 934 P.2d at 794-95. The court then concluded:

The trial judge found these mitigators insufficient to call for leniency when weighed against the three aggravating factors. . . . An abusive family background is usually given significant weight as a mitigating factor only when the abuse affected the defendant's behavior at the time of the crime. Defendant did not show any connection. On independent review, we do not believe Defendant established mitigation of sufficient weight to call for leniency.

*Mann*, 188 Ariz. at 231, 934 P.2d at 795 (citations omitted).

Analysis

The Eighth and Fourteenth Amendments prohibit the government from imposing the death penalty in an arbitrary or irrational fashion, and the Supreme Court has held that "meaningful appellate review" is necessary to ensure that the death penalty is not imposed in such a manner. *Pulley v. Harris,* 465 U.S. 37, 45 (1984); *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see Lopez v. Schriro*, 491 F.3d 1029, 1039 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008). Petitioner argues that the Arizona Supreme Court failed in this duty by omitting a detailed discussion of its findings regarding mitigation, by applying a causal connection test with respect to evidence of Petitioner's abusive childhood, and by erring factually in not finding that Petitioner had established such a connection between his troubled background and the murders. None of these contentions is persuasive.

The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and

mental problems] may be less culpable than defendants who have no such excuse." *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Therefore, a sentencing court is required to consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Kansas v. Marsh*, 548 U.S. 163, 175 (2006); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). In *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *See also Burger*, 483 U.S. at 789 n.7. However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the record to ensure the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d at 1037 (rejecting a claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant).

Applying these principles, it is apparent in Petitioner's case that the state courts fulfilled their constitutional obligation by allowing and considering all of the mitigating evidence. As noted above, the Arizona Supreme Court discussed the mitigating

circumstances advanced by Petitioner at sentencing, including his family background and history of substance abuse. The fact that the court found the mitigating information not weighty enough to call for leniency does not amount to a constitutional violation. *Eddings*, 455 U.S. at 114-15. This is true notwithstanding the court's discussion of the lack of a causal link between the mitigating circumstances and the crimes.

In *Tennard v. Dretke*, 542 U.S. 274, 289 (2004), the Supreme Court held that the habeas petitioner was entitled to a certificate of appealability on his claim that Texas's capital sentencing scheme failed to provide a constitutionally adequate opportunity to present his low I.Q. as a mitigating factor. The Court rejected the "screening" test applied by the Fifth Circuit, according to which mitigating information is constitutionally relevant only if it shows "uniquely severe" circumstances to which the criminal act was attributable. *Id.* at 283-84. Instead, the Court explained, the test for the relevance of mitigation evidence is the same standard applied to evidence proffered in other contexts – namely, whether the evidence has any tendency to make the existence of any fact that is of consequence to a determination of the action more or less likely than it would be without the evidence. *Id.* at 284.

The courts in Petitioner's case did not impose a relevancy test or any other barrier to consideration of the proffered mitigation. To the contrary, the trial court and the Arizona Supreme Court explicitly considered the evidence of Petitioner's traumatic childhood and chronic substance abuse. Again, no constitutional violation occurred when the state courts, perceiving the lack of a causal or explanatory relationship between the mitigating evidence and Petitioner's criminal conduct, assigned less weight to that evidence than Petitioner believes it warranted.[10] *See Eddings*, 455 U.S. at 114-15; *Ortiz*, 149 F.3d at 943.

---

[10] The Court therefore finds that the Arizona Supreme Court did not make a factual error in determining that Petitioner had failed to prove a connection between his family background and the murders. The fact that the state court was not swayed by Dr. Flynn's suggestion that such a relationship might have existed does not amount to a constitutional violation.

The United States Supreme Court has emphasized that there is no required formula for weighing mitigating evidence; indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant v. Stephens*, 426 U.S. 862, 875 (1983); *see Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994). This Court is unaware of any Supreme Court precedent establishing that mitigating evidence, once presented and under consideration, is entitled to a specific weight or holding that it is inappropriate for a sentencer, when weighing mitigating evidence, to consider, along with its humanizing impact, the extent to which the evidence offers an explanation of the criminal conduct.[11]

For the reasons set forth above, Petitioner is not entitled to relief on Claim 4.

**Claim 5        Victim Impact Evidence**

Petitioner contends that his Eighth and Fourteenth Amendment rights were violated when the trial judge reviewed letters from the victims' family members requesting that the death penalty be imposed. (Dkt. 37 at 72.) In addition to the letters, Petitioner also objects to a statement made at sentencing by victim Ramon Bazurto's mother. Petitioner notes that after hearing the statement, Judge Kelly asked for clarification regarding whether Ms. Bazurto was requesting the death penalty or a life sentence. (RT 2/1/95 at 5.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim that his rights were violated by the judge's handling of the victim impact information:

> The United States Supreme Court has held that a "State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant . . . as to whether or not the death penalty should be imposed." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) (overruling in part *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)). Arizona has made that choice and thus, under the Arizona Constitution, and to the extent allowed by *Payne* and our cases, victim impact evidence should be considered by the court to rebut the defendant's mitigation evidence.

---

[11]    The Ninth Circuit has recognized that mitigating evidence may serve both a "humanizing" and an "explanatory" or "exculpatory" purpose, with greater weight generally being ascribed to the latter category. *See Allen v. Woodford*, 395 F.3d 979, 1005-10 (2005).

. . . .

> We have held that such recommendation[s] do not tend to establish an aggravating circumstance and are therefore irrelevant for that *purpose*. The record in the present case, however, does not indicate that the judge gave weight to family opinions. In fact, he stated that the finding of aggravating circumstances was based solely on the evidence adduced at trial. In commenting about the families' opinions, furthermore, the judge merely stated that he understood their feelings. We see nothing in this record or the circumstances surrounding this trial from which to assume that the judge was improperly influenced by family recommendations.

*Mann*, 188 Ariz. at 228, 934 P.2d at 792 (citations omitted). The court then noted that the opinions of the family members were submitted not to a sentencing jury but to a judge and that "[a]bsent evidence to the contrary, we have assumed that the trial judge in a capital case is capable of focusing on the relevant sentencing factor and setting aside the irrelevant, inflammatory and emotional factors." *Id.* (quoting *State v. Bolton*, 182 Ariz. 290, 315-16, 896 P.2d, 830, 855-56 (1995)).

Analysis

As the Arizona Supreme Court noted, this claim is governed by the holdings in *Booth v. Maryland*, 482 U.S. 496 (1987), and *Payne v. Tennessee*, 501 U.S. 808 (1991), which prohibit the introduction of certain information on the grounds that it would lead a jury to impose a death sentence in an arbitrary and capricious manner. In *Booth*, the Supreme Court held that the admission of victim impact testimony at a capital sentencing constituted a per se Eighth Amendment violation. *Payne* reversed that holding but left in place the prohibition on opinions from family members about the crime, the defendant, and the appropriate sentence. 501 U.S. 808, 830 n.2 (1991).

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of *Booth* and *Payne*. Petitioner was sentenced by a judge, not a jury, and "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overturned on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). When victim statements include impact evidence and a sentencing recommendation, "in the absence of any evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence

he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997) (citing *Walton*, 497 U.S. at 653). Because there is no evidence to the contrary, this Court must assume the sentencing judge properly applied *Booth* and *Payne* and did not consider the sentencing recommendations of the victims.

Finally, the Arizona Supreme Court conducted an independent review of Petitioner's sentence, noted that the victims' sentencing recommendations were not relevant, and concluded that the death penalty was appropriate. *Mann*, 188 Ariz. at 226-231, 934 P.2d at 790-795. Therefore, any error by the trial court was harmless. *See Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (appellate courts are constitutionally permitted to affirm a death sentence based on independent re-weighing despite any error at sentencing).

For the reasons set forth above, Claim 5 is denied.

**Claim 6        Consideration of "Nonstatutory Aggravation"**

Petitioner alleges that in sentencing him to death the trial court impermissibly applied a nonstatutory aggravating factor. (Dkt. 37 at 77.) Respondents contend that the claim is unexhausted and procedurally barred. (Dkt. 45 at 44-45.) Regardless of its procedural status, the claim is plainly meritless and will be denied. *See* 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

The court sentenced Petitioner to death at a hearing on February 1, 1995. Petitioner thereafter filed a motion for "clarification of sentence" and reconsideration. (ROA 426-29.) The motion requested further explanation of the trial court's application of the especially cruel aggravating factor. (*Id.*) At a hearing on February 13, Judge Kelly indicated that the cruelty factor applied only to the murder of Bazurto and that the finding was based on Karen Miller's testimony that Bazurto remained conscious for a period of time after he was shot. (RT 2/13/95 at 3.) Judge Kelly then responded to Petitioner's argument that the circumstances of the murders did not place them above the norm of first degree murder cases warranting imposition of the death penalty:

> I thought you did a good job, Mr. Sherman, of . . . saying to the Court, well, this case was not one that was different from the normal murder in the sense of multiple stabbings, rape, these types of horrible things, but the thing about

> this case, and I forgot to say this at sentencing, I meant to say it, the thing about this case that always in my mind set it apart, was it was so cold and calculated and a very chilling thing to think "well, I got – I'm going to do this and I know I'm going to do this and I know I'm going to first murder one person and then two people." To do it totally sober, there was no alcohol involved. There were no drugs involved. It was a cold and calculated murder and it that sense I felt that it was set apart.

*Id.* at 5-6.

It is clear that Judge Kelly, having found that Petitioner was eligible for the death penalty based on the existence of three aggravating factors, was simply citing the facts of the case to reject Petitioner's broader argument that the murders were not sufficiently egregious to warrant a death sentence. Even assuming that the judge viewed the cold-blooded nature of the killings as an additional aggravating factor, there was no constitutional violation. As previously noted, the United States Supreme Court has held that once a defendant is found eligible for death based on a constitutionally sufficient narrowing circumstance, the sentencer's discretion is virtually unlimited. *Zant v. Stephens*, 462 U.S. at 878-79; *see Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003). The Court has also held that consideration of a nonstatutory aggravating circumstance, even if contrary to state law, does not violate the Constitution. *Barclay v. Florida*, 463 U.S. 939 (1983).

Finally, the Arizona Supreme Court conducted a separate, independent review of the aggravating and mitigating factors and determined that Petitioner's death sentence was appropriate. *Mann*, 188 Ariz. at 226-31, 934 P.2d at 790-95. Therefore, even if the trial court had committed constitutional error at sentencing, a proper and independent review of the mitigation and aggravation by the state supreme court cured any such defect. *See Clemons*, 494 U.S. at 750, 754. Claim 6 is denied.

**Claim 7        Failure to Consider Mitigation – Disparity in Sentences**

Petitioner alleges that the disparity in his sentence when compared with the treatment of his accomplices, Miller and Alejandro, who were not prosecuted, constituted a significant mitigating factor which the state courts improperly ignored. (Dkt. 37 at 79.)

In sentencing Petitioner, the trial court considered but rejected Petitioner's argument that the disparate treatment of his accomplices constituted a mitigating factor. The court

explained:

> It is clear that these crimes were planned by the Defendant. The other people involved were told what to do by him. They were under his control. But more importantly in this case, the State had to make deals with these people in order to provide evidence that would lead to the conviction of the Defendant.

(ROA at 416.)

On direct appeal the Arizona Supreme Court likewise rejected Petitioner's claim:

> Karen Miller was an active participant in the drug rip-off scheme and murders. Reporting the crime four years after it occurred, she was granted immunity and never charged with any offense in connection with the case. Disparity in the sentences given a defendant and an accomplice can be a mitigating factor in deciding whether a death sentence is appropriate. When it is considered, disparity is mitigating only when it is unexplained. The disparity here is primarily explained by the difference in culpability – Defendant was the instigator of the crime and the killer – and also because the state granted Miller and Alejandro immunity from prosecution to obtain testimony necessary to any prosecution for the killings.

*Mann*, 188 Ariz. at 230, 934 P.2d at 794 (citations omitted).

Analysis

As the state supreme court noted, under Arizona law unexplained disparity in sentences may constitute a mitigating circumstance. In this case, the disparity was easily explained: Petitioner planned the drug rip-off with the intent to kill the buyer and was the actual shooter of the two victims. His responsibility for the murders far exceeded that of Miller and Alejandro, whose testimony was necessary to convict him. Moreover, even if the Arizona Supreme Court erred in applying its own law by failing to assign mitigating value to the disparity in treatment, there was no constitutional violation.

In *Pulley v. Harris*, the Supreme Court considered the argument that the Constitution mandates a comparative proportionality review that "purports to inquire . . . whether the penalty is . . . unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime." 465 U.S. at 44. The Court rejected this argument as contrary to its holdings in *Jurek v. Texas*, 428 U.S. 262 (1976), *Gregg v. Georgia*, 428 U.S. 153 (1976), and *Proffitt v. Florida*, 428 U.S. 242 (1976). *Id.* at 50-51. The Court reaffirmed *Pulley* in *McCleskey v. Kemp*, 481 U.S. 279 (1987), expressly holding that a defendant could not "prove a constitutional violation by demonstrating that

other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey*, 481 U.S. at 306-07. The circuit courts have recognized this principle. *See Getsy v. Mitchell*, 495 F.3d 295, 305-09 (6th Cir. 2007) (Eighth Amendment did not require proportionality between defendant's death sentence for aggravated murder and attempted aggravated murder and life sentence imposed on aggravated murder conviction of codefendant who had been responsible for masterminding and directing the killings); *Beardslee v. Woodford*, 358 F.3d 560, 579-81 (9th Cir. 2004) (rejecting argument that "different sentences for equally culpable co-defendants violate the prohibition against arbitrary imposition of the death penalty"); *Bush v. Singletary*, 99 F.3d 373, 375 (11th Cir. 1996) (per curiam) (no federal constitutional claim based on the fact that the defendant's death sentence was disproportionate to that of his co-defendant, whose death sentence had been vacated on appeal); *Hatch v. Oklahoma*, 58 F.3d 1447, 1466 (10th Cir. 1995) (rejecting claim that the constitution required "a proportionality review of his sentence relative only to his co-defendant"), *overruled in part on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001); *Russell v. Collins*, 998 F.2d 1287, 1294 (5th Cir. 1993) (denying relief to petitioner who argued that his death sentence was disproportionate to that of co-defendant who had pled guilty and been sentenced to sixty years).

The decision of the Arizona Supreme Court rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable interpretation of the facts.[12]  Therefore, Claim 7 is denied.

**Claim 8       Especially Cruel Aggravating Factor**

Petitioner alleges that his rights under the Eighth and Fourteenth Amendments were violated when the state courts found that the murder of Ramon Bazurto was especially cruel

---

[12]     Petitioner alleges that the state courts erred in finding that promises not to prosecute were necessary to secure the trial testimony of Miller and Alejandro. (Dkt. 37 at 81.) This assertion is pure speculation and, as Respondents note, "ignores the realities of the criminal justice system." (Dkt. 45 at 49.) It is also immaterial, given that the disparate treatment was adequately explained by Petitioner's far greater culpability in the murders.

under A.R.S. § 13-703(F)(6). (Dkt. 37 at 83.) Respondents contend that the claim is unexhausted and procedurally barred. (Dkt. 45 at 51.) The Court disagrees. Petitioner raised this claim on direct appeal and his citations to the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution (Opening Br. at 35, 49) were sufficient to present the federal basis of the claim.[13] *Gatlin*, 189 F.3d at 888. The Court will therefore consider the merits of Claim 8.

Background

At trial Karen Miller testified that Bazurto fell to the ground after being shot; he lay on his back with his eyes open; he was moaning and moving his arms, apparently trying to reach a pistol protruding from the waistband of his pants. (RT 10/26/94 at 48-49.) According to Miller, this continued for three to five minutes before Bazurto took a final deep breath and stopped moving. (*Id.* at 49-50.) During this time Petitioner stood over the victim while he explained to Miller that Bazurto was "going through the death process" and "losing his motor function." (*Id.* at 50.) Petitioner seemed "fascinated" by the phenomenon. (*Id.*) When it appeared Bazurto was dead, Petitioner "picked him up by his hair and sat him up and swung him around into the bedroom on the tile and dropped him on the floor."[14] (*Id.*)

Dr. Thomas Henry, the forensic pathologist who performed the autopsies of the victims, testified that given the nature of Bazurto's injuries – the bullet struck his aorta – he would have remained conscious for approximately ten to twenty seconds before passing out from blood loss. (RT 10/27/94 at 20.) Dr. Henry acknowledged, however, that there were variations in how an individual would react to such a wound. (*Id.* at 49.) He also testified that if Bazurto had engaged in purposeful movements, such as those observed by Miller, it

---

[13]     The claim was also exhausted by the Arizona Supreme Court's independent review of Petitioner's sentence and its actual review of the trial court's finding of the (F)(6) factor. *See, e.g.*, *State v. Gretzler*, 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983); *Beam v. Paskett*, 3 F.3d 1301, 1306 (9th Cir. 1993); *Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984).

[14]     Miller's trial testimony concerning the details of Bazurto's death was consistent with her previous testimony at a preliminary hearing. (*See* RT 44/94 at 27-28.)

- 35 -

would indicate that he was not in shock but had remained conscious for a period after being shot. (*Id.* at 50.)

In applying § 13-703(F)(6), the trial court found that "Ramon Bazurto survived long enough after being shot to recognize his impending death and to suffer, [] that the Defendant, by his statements to Karen Miller, indicated a relishment of the watching of the death of Ramon Bazurto," and that "Ramon Bazurto was totally helpless after being shot."[15] (ROA at 412.) At the hearing on Petitioner's motion for reconsideration, the trial court noted the possible conflicts in the testimony of Miller and Dr. Henry regarding Bazurto's condition, but explained:

> I felt that Karen Miller's testimony was pretty compelling as to what she described and that the pathologist was not certain that the victim would not have suffered, although there was some discrepancy there. I thought her testimony in that respect was compelling and I went with that rather than the pathologist's estimate of what might have happened.

(RT 1/13/95 at 5.)

On direct appeal, the Arizona Supreme Court agreed that the (F)(6) factor had been proved based on the cruelty of the killing:

> To show a murder was especially cruel, the state must prove beyond a reasonable doubt that the victim consciously suffered physical or emotional pain. Defendant argues that the medical examiner testified that Bazurto probably was conscious only for ten to twenty seconds and during that time may have been in a state of shock. But Karen Miller testified that Bazurto was alive for three to five minutes. The judge found Karen Miller's testimony more persuasive. Conflicts in the evidence are for the trial judge to resolve. The judge explained he believed Karen's compelling testimony and discounted the pathologist's testimony because the medical examiner was uncertain whether Bazurto would have suffered.
>
> Given Karen's testimony and the judge's findings, the evidence was sufficient to find the murder was cruel because Bazurto was alive and conscious for an appreciable period of time. Moreover, Defendant did not contend Karen's observations that Bazurto was conscious and attempted to defend himself were scientifically or medically impossible, nor did Defendant

---

[15] This ruling appears to encompass findings that the murder was both cruel and heinous or depraved. Under Arizona law, factors supporting a finding that a murder was heinous and depraved include the defendant's relishing of the murder and the helplessness of the victim. *See State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983). The Arizona Supreme Court addressed only the cruelty prong in affirming the trial court's (F)(6) finding.

provide any evidence to that effect.

*Mann*, 188 Ariz. at 226, 934 P.2d at 790 (citations omitted).

Analysis

With respect to a state court's application of an aggravating factor, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

Section 13-703(F)(6) establishes an aggravating factor where "the defendant committed the offense in an especially cruel, heinous or depraved manner." The statute, worded in the disjunctive, is satisfied if any of the three circumstances is established. *See State v. Herrera*, 176 Ariz. 21, 34, 859 P.2d 131, 144 (1993). The especially cruel prong of (F)(6) addresses the suffering of the victim. *See State v. Murray*, 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995). Thus, "a crime is committed in an especially cruel manner when the [defendant] inflicts mental anguish or physical abuse before the victim's death." *State v. Walton*, 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1993); *see Herrera*, 176 Ariz. at 34, 859 P.2d at 144. Mental anguish is established if the victim was conscious for a period of time and "experienced significant uncertainty as to her ultimate fate." *State v. Van Adams*, 194 Ariz. 408, 421, 984 P.2d 16, 29 (1999); *see Herrera*, 176 Ariz. 21, 34, 859 P.2d 131, 144.

From the trial testimony a rational factfinder could have determined that the (F)(6) factor was proved. Although Petitioner challenges Karen Miller's testimony, this Court must view the evidence in the light most favorable to the State, with deference to the credibility determinations made by the trial court. From this perspective, a factfinder could have

determined, based on Miller's eyewitness testimony, that Bazurto remained conscious for a period of time after being shot and that he suffered mentally and physically until his death. As the Arizona Supreme Court held, this was sufficient under state law to establish cruelty for purposes of (F)(6). *Mann*, 188 Ariz. at 226, 934 P.2d at 790 (citing *Herrera*, 176 Ariz. at 34, 859 P.2d at 144) (period of consciousness between eighteen seconds and several minutes was sufficient)).

Furthermore, the Court notes that Judge Kelly sentenced Petitioner to death for the Alberts murder on the basis of the multiple homicides and pecuniary gain aggravating factors; the Arizona Supreme Court affirmed. Since these two factors also applied to the murder of Bazurto, there is no reasonable probability that Petitioner's sentence would have been altered by invalidation of the (F)(6) factor.

For the reasons set forth above, Claim 8 is denied.

**Claim 9        Pecuniary Gain Aggravating Factor**

Petitioner alleges that his rights under the Eighth and Fourteenth Amendments were violated when the state courts found that the Bazurto murder satisfied the pecuniary gain aggravating factor.[16] (Dkt. 37 at 90.)

Petitioner contends the pecuniary gain finding was erroneous because the shooting of Bazurto was unplanned, "accidental and incidental to the murder of Richard Alberts during an alleged drug ripoff," and the money was taken only from Alberts. (Dkt. 37 at 91.) On direct appeal, the Arizona Supreme Court rejected this claim:

> Defendant argues the trial judge erred in finding pecuniary gain under § 13-703(F)(5) because Bazurto appeared unexpectedly and Defendant had not previously contemplated killing him. Because the murder of Bazurto was not part of the rip-off plan, Defendant argues the judge erroneously found the pecuniary gain aggravating factor.
>
> This circumstance exists when pecuniary gain is a motive or cause for the murder. Murdering a person to facilitate a robbery and escape constitutes murdering for pecuniary gain. Defendant planned to and did murder Alberts to steal $20,000. When Bazurto unexpectedly showed up at the house, Defendant made a choice after a period of thought and said, "Well, I got to do

---

[16]        For the reasons set forth with respect to Claim 8, this claim is exhausted.

it," apparently meaning that to go through with the plan he would also have to murder Bazurto. Even if killing Bazurto was not part of the original plan, stealing the money was the "motive, cause, or impetus," for the murders of both Alberts and Bazurto. The pecuniary gain aggravator therefore applies in this case.

*Mann*, 188 Ariz. at 227, 934 P.2d at 791 (citations omitted).

"[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th 2005). Based upon the facts proven at the trial, including testimony that Petitioner planned and carried out the drug rip-off and both murders in order to gain $20,000 in cash, a rational factfinder could have determined that Bazurto was murdered in the expectation of pecuniary gain and that Petitioner was motivated solely by the expectation of such gain. *See Correll v. Stewart*, 137 F.3d 1404, 1420 (9th Cir. 1998); *Woratzeck v. Stewart*, 97 F.3d 329, 336 (9th Cir. 1996).

As the Arizona Supreme Court noted, the evidence showed that the killing of Bazurto, while not part of the original plan, was seen by Petitioner as necessary to complete the robbery. "When the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant." *State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987); *compare State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986) (insufficient evidence to support pecuniary gain aggravating factor where defendant's motive was relationship difficulties with the victim and the taking of money and keys was incidental to the murder). Here, because the drug rip-off "permeated [Petitioner's] entire conduct," *LaGrand*, 153 Ariz. at 36, 734 P.2d at 578, a rational factfinder readily could have determined that the pecuniary gain factor was established.

Petitioner is not entitled to relief on Claim 9.

**Miscellaneous claims: "Unconstitutionality of the Death Penalty and Its Procedures"**

Petitioner raises a series of allegations challenging the death penalty and its application to his case. (Dkt. 37 at 92-96.) Respondents contend that the claims are procedurally barred, having never been raised in state court. (Dkt. 45 at 56.) Regardless of

their procedural status, the claims are plainly meritless.

First, Petitioner provides no support for his primary contention that the Arizona death penalty scheme is overbroad and leads to the arbitrary imposition of the death penalty. Rulings of both the United States Supreme Court and the Ninth Circuit have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Lewis v. Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996). The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith v. Stewart*, 140 F.3d at 1272.

Next, the United States Supreme Court has never held that lethal injection constitutes cruel and unusual punishment, *see Baze v. Rees*, 128 S. Ct. 1520 (2008), and the Ninth Circuit has concluded that death by lethal injection in Arizona does not violate the Eighth Amendment. *See LaGrand v. Stewart*, 133 F.3d 1253, 1264-65 (9th Cir. 1998).

Finally, the United States Supreme Court has not held that lengthy incarceration prior to execution constitutes cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 129 S. Ct. 1299 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue). Circuit courts, including the Ninth Circuit, have held that prolonged incarceration under a sentence of death does not offend the Eighth Amendment. *See McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995).

Petitioner's claims that the death penalty and its implementation in Arizona are unconstitutional are denied.

## <u>CONCLUSION</u>

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. The Court further finds that Petitioner is not entitled to an evidentiary

hearing.

<h1 style="text-align: center;"><strong><u>CERTIFICATE OF APPEALABILITY</u></strong></h1>

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability ("COA") to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court finds that reasonable jurists could debate its resolution of Claims 1, 2, and 4. For the reasons stated in this Order, the Court declines to issue a COA with respect to any other claims.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 37) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on April 28, 2003, (Dkt. 3) is **VACATED.**

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

Whether Claim 1 of the Amended Petition – alleging ineffective assistance

1  based on counsel's failure to call Petitioner as a witness at trial – is without
   merit.

2

3  Whether Claim 2 of the Amended Petition – alleging ineffective assistance of
   counsel at sentencing – is without merit.

4  Whether Claim 4 of the Amended Petition – alleging an Eighth Amendment
   violation based on the Arizona Supreme's Court review of Petitioner's death
5  sentence – is without merit.

6      **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

7  this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

8  85007-3329.

9      DATED this 10th day of August, 2009.

10

11

12  _____
                 Cindy K. Jorgenson
13          United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28